Good morning. May it please the Court. My name is Carol Ilusky, and I represent the appellant, Mr. Armstead, in this case. And I'd like to reserve three minutes for rebuttal, please. Starting with the January 26, 2004 search of Mr. Armstead's residence, there were several items recovered during this search, but the primary item, the one that was the bedrock of the government's case, was the bag with the identification documents and the false driver's licenses found outside Mr. Armstead's residence. The issue I'd like to address first on this matter is the issue of waiver, which the government raises. And there was absolutely no waiver in this case. And to the extent that I was less than clear in my briefs on that, I apologize, but I'd like to take a moment to set the record straight. Excuse me, but just so I can follow, the waiver applies to what was found outside, right? Is that right? There is no waiver of what was found outside. No, I mean the government's argument. That's right, Your Honor. It applies only to what was found outside. That's right. Go ahead. In Mr. Armstead's initial suppression motion, which I cited in my reply brief, he gave a blanket, all evidence, statements and other proofs resulting from the unlawful entry and search. He blanked the blanket description of what he wanted to suppress from that search. Then in a document filed in March 2006, it was document 316, he listed the items found in that search that he was contesting, and he specifically listed the bag and the items found in the bag. He ended up listing the additional items because he was adding an additional argument to his suppression argument. He was challenging them on probable cause, lack of good faith reliance, and outside the scope of the warrant. Then at the suppression hearing, ER 25, he begins his argument. He says, We're contesting the things found inside and outside the apartment on scope, exceeding the scope of the warrant. During the suppression hearing, it became clear that the judge was interested in the scope of the warrant issue. She was interested in places where you couldn't possibly find a hard drive, like in a folder. So by the end of the suppression hearing, the judge asks, this is at ER 51, the judge asks Mr. Armstead, are you still objecting to what was found in the bag outside the apartment for scope of the warrant? She limits it to that, and he says no. So he never waived his objection to the admission of the bag in this case. Does the Court have any concerns on that issue? No, I have a lot of concerns. And the waiver issue? Yeah. Well, you know, I don't think the transcript is, you know, as clear as you say. I think, you know, in some parts, there seems to be a waiver. But we'll figure that out. I think you ought to move on. Okay. Moving on to when he raised it in his documents, when he raised it twice in the documents filed in the Court, and he raised it again at the beginning of the suppression hearing, I don't see how we could have an issue of waiver in this case. But moving on here. His comment on waiver is whether at the end when he said he's not contesting the outside, and your reading of that is that he's not contesting it as far as the scope of the warrant is concerned? Yes, Your Honor. And can I read that to you? But he is contesting it as far as the fruits of the poisonous tree, you said. He's contesting it as far as lack of probable cause, lack of good faith reliance. Well, that goes to the whether it was discovered as a result of the illegal search, if it was illegal. Right. But he made it clear. It doesn't make sense to me what you just said, so can I just back up a minute? It makes sense if you say, well, that the warrant is kind of irrelevant to that because it's a fruit of the warrant ultimately. But then you said, but it goes to good faith. And that, in my mind, would put you back into whether the warrant, what was in the scope of the warrant. The argument is that the warrant was invalid because no probable cause, no good faith, so that everything discovered pursuant to that warrant or as a fruit of that warrant, as you said, Judge Reinhart, was equally unable to come in. What the judge asked him at the end of the hearing was, are you arguing that taking the items from outside exceeded the warrant? And he says no. But that's in regard to exceeded the scope of the warrant. Can we look in the bag for a hard drive? Yes, you can look in the bag for a hard drive. But if the warrant's no good, then the bag shouldn't have been admitted either because it was the fruit of the unlawful warrant. Does that clear it up? Not for me. I mean, I hear what you're saying. I'm going to try to process it. Okay. Let me just ask you about that, though. The bag is outside, correct? That's right. You don't need a warrant for the bag? You do in this case, Your Honor, because the bag was found solely because of the officer's search of the apartment. And the district court said that it wasn't. But the district court didn't have the information that we have and that the parties had at the time. At the trial, it became clear with the officers, the two detectives' testimony, that the only reason they went outside the apartment in this case was because of what they found inside the apartment. We have the exhibits, which the prosecution submitted, showing the pictures of the dirt on the windowsill. We've got the dirty footprints underneath the windowsill. We've got the open window. We have the two detectives saying, well, yeah, we went into the bedroom and we saw this, and we thought this looked like a place where they went in and out. So we went out there, and we went looking, and we found the bag. So it was only discovered pursuant to the search inside the apartment, which was done pursuant to a warrant. I'd like to move on, unless there are any concerns about that, to probable cause and good faith. There may be concerns, but there apparently are no more questions. Yeah, go ahead. I'll direct the Court's attention to the excerpts of record at 66 to 70, where Detectives Teachworth and Devereux are describing how they searched the apartment and how they went outside the apartment to find the bag. And that's when the exhibits were also introduced. Okay. Do you want to get on to the question of why the search was illegal? Thank you, Your Honor. I actually want to address any questions that you have, so please feel free. Well, I don't have any. Well, my questions really go to, you know, even assuming that the warrant was not sufficient, whether they're entitled to the good faith exception. Okay, Your Honor. We'll start with good faith. The first reason that good faith reliance is unjustified in this case is because of the utter lack of any indicia of probable cause to find the hard drive in Mr. Armstead's apartment. The issuing court had two affidavits it was looking at, the one for Hill's residence and the one for Armstead's residence. What it knew from these affidavits was that Hill was involved in making counterfeit IDs, that Hill had a stationary desktop computer with a removable hard drive in his The court knew that the hard drive was in that computer on January 24th, somewhere between 4 and 5, when the CI went over to the apartment and got an ID made. The court was told that two days later, when Hill's apartment was searched, the hard drive wasn't there. At 1230 on the 26th, when the police encountered Hill, he didn't have the hard drive with him. And the affidavit also told the court that Hill and Armstead had a past criminal association, and particularly in that Armstead directed Hill and others to make fraudulent IDs. These facts are clearly sufficient to link Hill to his hard drive and to link Armstead to Hill, but they don't link Armstead's hard drive to Armstead. So, you know, if you have to have just a colorable argument, and I know there's a problem with, you know, not looking far enough in the house in terms of the hard drive. The hard drive's not there. They've been involved in forgery. They try to find the hard drive. It's not there. He's left. He's go to this guy's house. Why isn't that enough to say, well, we're looking for the hard drive? Obviously, it's in transit somewhere, and it's not on him, and therefore, it's, you know, believable that it's probably with this guy, who he's now with. Because of the time frame, Your Honor. Because they only knew where the hard drive was almost 48 hours before this time. They knew on the 24th where the hard drive was. They didn't have surveillance going on. They don't know where Mr. Hill went in the next 48 hours. They don't know who came to his house who might have taken the hard drive away. They didn't have surveillance going on at Armstead's house. They didn't see Hill take anything into Armstead's house. They didn't even see Hill leave anything with Armstead's house. And I'd like to just talk about that a little bit, because I think the government and the police officer both relied on the fact that when they arrested Hill, he had these documents related to counterfeiting in his hands, and he tried to get rid of them. But this doesn't connect the hard drive to Mr. Armstead's residence, because there's no evidence that Hill actually took those into Mr. Armstead's residence or anything else into Armstead's residence. Because if you look at the affidavit, this is page 14 of the excerpts of record, the officer says they saw police walk to his car. I'm sorry.  They didn't say they saw anything in his hands. They arrested him, quote, as he was rummaging through his vehicle, and that as he was arrested, he made an obvious attempt to throw items in his hands over a fence. So all the facts show is what he had in the vehicle. He had these driver's insurance cards, and he had the plastic laminate sleeves in his vehicle. He was rummaging. He tried to get rid of them when he was arrested. These facts show nothing about what he might have brought into Armstead's residence or what he might have left at Armstead's residence. Well, the district court found there wasn't probable cause. How do you draw the line once you find there isn't probable cause as to what's enough for good faith? I think that's something that you, as a case-by-case basis, you have to see what's in the four corners of the affidavit. Does this provide a likelihood, a substantial probability that the hard drive is going to be in Mr. Armstead's apartment? Well, if it did, that would be probable cause, wouldn't it? I think that courts are more lenient on the good faith issue, on the good faith aspect of probable cause. But there's no deficient. Right. It can be sufficiently deficient. So what we have, we have the missing hard drive, and despite the association, the timing, and not just association but forgery, I guess what you're saying is you think you would need to know where the hard drive was or have reason to think he took it to Mr., you know, the Mr. Hill. Or to have it in Armstead's apartment. Or to have. And you'd have probable cause. So you're somewhere between knowing and not knowing. Well, I think they would have had to have some indication that Armstead ever had a hard drive in his apartment, let alone Mr. Hill's hard drive. There's just nothing in either affidavit connecting a hard drive with his apartment. Well, they're forging documents, right? Not in the affidavit. The affidavit says that Rusty Hill is forging documents and that Armstead directs Hill and others to forge documents. It doesn't say that they are forging documents together or that they share the work on the forged documents. And the point that you brought up also about the lack of searching the entire apartment also gives this Court reason to find that there wasn't good faith in this case. This amounted to a material omission in the affidavit. The attesting officer told the Court when they searched Rusty Hill's apartment the hard drive wasn't present. But the attesting officer knew that they hadn't searched the entire apartment. They had searched Rusty Hill's quarters. The fact that they left that out of the affidavit, if they had put that in, there wouldn't have been probable cause. The Court simply couldn't have upheld a warrant that said we didn't. It didn't uphold a warrant. It said there wasn't. No, I'm sorry. The issuing magistrate couldn't, the issuing judge couldn't have issued, couldn't have approved the warrant. If the cop had gone ahead and said we think we thought it was in Hill's apartment but we looked in part of it and we didn't find it. We haven't finished searching the apartment but we now want to search in Armstead's apartment. There would have been no justification to search in Armstead's apartment if he had come forward with all that information. And even if it wasn't a reckless or an intentional withholding of information, it shows facts known to those officers that wouldn't allow them to rely in good view that they hadn't finished searching all of Hill's apartment. And, in fact, in the warrant for searching Rusty Hill's apartment, the officer went out of his way to explain that they expected everything to be there. He was saying that this isn't a case where time is of the essence because these things stay. This is at the supplemental excerpts of record at 10. The officer said, The majority of suspects who maintain full-time residences, as in this case, will keep the document creation equipment in the same location for as long as they live in a given location. So on the one hand, they're telling the court, we expect it all to be here. But then on the other hand, they go there, they don't find it in the rooms where Rusty Hill lives, and they don't bother to search the rest of the apartment before they say, we want probable cause to go someplace else because we know this is a bad guy and we want to search his apartment. I know you have a lot of issues in your case. Yes. But may I ask you about one that I have some concern about? And that is the number of victims. And the difference between people who could be victims because you might extrapolate some pecuniary loss by having to go to the bank or get new IDs versus people who are victims because they're actually included in the actual loss calculation. So we seem to have kind of two different theories crossing here as to how one defines a victim and then how the district court is supposed to calculate it. And I'd be interested in your explanation on behalf of your client as to what you think is the appropriate way. Yes, Your Honor. And, again, I think the housing counsel and I sort of got a little involved in this discussion, where the discussion is really quite simple. I think the dispositive answer of who is a victim is directly in the guidelines. It's application note one. It's the definition of victim, which says that a victim is any person who sustained any part of the actual loss determined under subsection B1. Now, subsection B1 is the provision of the guideline where the court determines how much loss to attribute to the defendant so that it can enhance the base offense level. What this guideline tells us is that unless they include a person's loss in this calculation of loss amount under 2B1.1B1, that person's not a victim. And it seems like a very narrow result, but it is narrow, and that's what the Sentencing Commission intended. The sentencing ---- Let me just stop there. Let's assume the victim had what we'll call a transitory loss because they got their loss. They could still be a victim if they were ---- if that amount was included in the loss calculation. Is that what you're saying? I mean, how would that work? If the amount was included in the loss calculation, it would have had to pass the other tests in the guidelines, such as not being excluded from loss because it's a de minimis expense associated with a bank account and because it's foreseeable. But, yes, if it were included, they would qualify under the definitional section of victim as well. The guideline could have cast a wider net. The guideline could have said anybody who suffers pecuniary harm is a victim. It doesn't say that. It could have said anybody who was the intended ---- who was intended to suffer loss is a victim. It doesn't say that. It simply directs you to the calculation of loss provision. And I submit that we should follow the guidelines plain language. I'll reserve my remaining time for rebuttal. Thank you very much. Thank you, counsel. Good morning. May it please the Court. My name is Tessa Gorman. I'm an assistant United States attorney representing the United States. I would like to start with the waiver argument as well, Your Honors. The only conclusion based on this record before this Court is that counsel waived this argument to the admission of that bag. Not only is that clear from the suppression hearing where he explicitly stated that he was not seeking admission of the bag, the Court's ruling not addressing the bag is contemplated by counsel's explicit statement, but also, again, at trial. Where does he make that or the trial lawyer make that concession? Is it in the transcript? When the child court makes its ruling. No, you're talking about the concession of the attorney. Let's start there. I believe it's at 59, Your Honor. 59, okay. I could get the exact site. But counsel's asked if he is seeking he's addressing the bag, and he says, no, I'm not addressing anything that was found outside the apartment. And then the ruling? The ruling is at ER 60, Your Honor. And at that time, you just read what they say on I'm not including the bag outside the apartment. That's on 59. 59 of what? I find 59 of an exception is just the Court speaking. Sorry, Your Honors. I know the Court's ruling is on 59 to 60. Yes, but it was counsel's statement. And I believe counsel – I'm sorry, I don't have that exact site right now, Your Honors. But at some point, and I think Capell counsel raised it with – when there was a discussion about the application of the search of the residence. So on the scope of the search, there was questions by the Court about what counsel was narrowing his argument to. And he said the check and the folder found inside the home. Well, that's on page – I think she talked about, Mr. Lucey, on page 51, where the Court says – talking about the outside items. That's correct. Are you arguing that taking the item from outside exceeded the warrant? So she says that only goes to the scope of the warrant. And then in her ruling, though, the judge only addresses the check and the folder, never addressing the bag. So counsel did not pursue the suppression of the bag when the Court was making its findings and rulings on suppression. And that's at ER 60. But to the extent – You mean counsel didn't waive it, but the Court said it erroneously, and counsel didn't call the Court's error to its attention? I don't – I think counsel waived it, Your Honor. I don't believe there was any – Wait a minute. That's what we're trying to find out. Where did counsel waive it? Judge Teshima pointed out that on page 51, counsel was talking about whether it exceeded the scope of the warrant and said she wasn't talking about the bag when she was talking about exceeding the scope. To the extent that it's not clear in the suppression hearing at trial when the where, throughout the trial, there are examples of where counsel objected to admission and then was given a standing objection by the Court, preserving his issue. But if I may move on to good faith, to the extent that this Court would entertain counsel's argument about the admission of the bag. And I know in this Court's case in Cruz, it does seem to look at good faith first before even looking at probable cause. The government certainly submits that there was probable cause in that warrant. But the good faith exception applies when officers relied on the search warrant in an objectively reasonable manner. And when there's a colorable basis for probable cause, this Court has found that there is. But you have to address, too. I think part of Mr. Woosky's argument is that, you know, the affidavit that the officer prepared is somewhat misleading. Your Honor, I'd like to... So how does... In other words, you know, they never disclose that the search was limited just to this guy's room and not to the entire residence, right? How does that figure when they sort of create the conditions that lead to the issuance of the warrant? Well, I think the issuing judge could have inferred that the officers had confined their search to the downstairs where, in fact, they searched. And that is because in the original affidavit that was submitted to the same issuing judge and then attached to the second affidavit for Mr. Armstead's condominium, the affidavit says, and I'm quoting. This is from Pellitt's Supplemental Excerpts of Record 8. So it's the original affidavit. The CI, confidential informant, said this house is owned and occupied by Hill's The CI said that Hill's parents were not aware of or involved in the counterfeiting operation. I think that language, when combined with the addendum which told the court they had searched and had not found, the issuing court could have inferred that the part of the house they had searched was where the agents or the officers knew that Rusty Hill was living and operating this counterfeiting operation, especially in light of the language that his parents were not aware of or involved in the counterfeiting operation. And to that issue, Judge Peckman, who was presiding over the motions hearing, was well aware that the officers did, in fact, only search that part of the house. And she was also aware, because Rusty Hill testified, that the hard drive was later found in Rusty Hill's section of the house. So to the extent there were credibility determinations being made by the court about the good faith of these officers, she heard the detective who was the affiant in the search, and also the detective who was involved in the search, she heard him testify. And both trial counsel and appellate counsel have focused on the fourth prong of where good faith doesn't apply, and that is when the affidavit does not have a colorable or has no indicia of probable cause. They have not focused on the first prong, which is a false statement. And trial counsel did not raise that at the suppression hearing when he heard the detective testify about his search. All right. What are the indicia of probable cause in this warrant? In the two warrants together? Well, the original affidavit establishes that Rusty Hill was conducting an extensive counterfeiting operation where he was manufacturing counterfeit Washington State driver's licenses. The addendum, which is the service as a basis for the search of Mr. Armstead's house, gives information about Mr. Armstead as well and his past involvement in these sorts of operations, forgery and identity theft. Detective Teachworth, who provided information in the affidavit, had arrested Armstead three times since 2002 and called him a ringleader in the forgery culture. He stated, the affidavit stated that Armstead collected stolen personal information, directed others to collect his stolen information, and directed others, including Hill, to create counterfeit IDs. And, in fact, on these arrests, counterfeit Washington State driver's licenses were located on or in Armstead's area during these arrests. The affidavit also talks about an October 2003 seizure at Mr. Armstead's apartment, which is outside in the parking lot, by a car which he was associated with, where officers seized several counterfeit Washington State ID cards, stolen credit cards, and stolen personal information. Where do you say this was? Outside in a parking lot? It was in a parking lot in a bag outside of Mr. Armstead's condominium, the same condominium that was searched in January 2004. So the affidavit sets up Mr. Armstead's past involvement in this sort of behavior, but then it does a connection between Mr. Hill and Mr. Armstead. And the first obvious connection is Mr. Hill is coming from Mr. Armstead's apartment on the day of the search. Mr. Hill admits that he's coming from Mr. Armstead's apartment. Mr. Hill, when arrested, throws false car insurance cards along into victims. So, again, showing his involvement in this counterfeit operation or identity theft. Mr. Hill's person is searched and his car is searched. Officers then could make the reasonable conclusion, there's a fair probability that a missing hard drive, a very important piece of information to Mr. Hill because he made $200 in ID making these fraudulent Washington State driver's licenses, would have with him or in a place that was secure. From that, those are the connections in the affidavit for probable cause. But I don't know if you want me to address more of the probable cause or if I could continue. No, no, no. But just summarize. All right. So first, I mean, the chain is, how does the chain go? First, they searched his room and it wasn't there, right? They searched his entire area downstairs, Your Honor. And it wasn't there? And then next what? The next is they go over to Mr. Armstead's house to do surveillance. Because of this past connection between Mr. Armstead and Mr. Hill, officers go to Mr. Armstead's house to see if Mr. Hill is there. They find his But how does, and this is, I think, your opponent's argument. How does the fact that it was not in Hill's room give probable cause that Armstead had it? This prior connection between the two of them showing there was a connection in identity theft and in You mean that they were working together? In May of 2003, as the affidavit states, Mr. Armstead was arrested and his apartment was searched. And in his apartment, he was arrested and involved with a Dania incident. And his apartment was stolen furniture from Dania as well as counterfeit Washington State driver's licenses and personal and identifying and financial information of victims. Mr. Hill had rented the U-Haul from Mr. Armstead that was used to transport the furniture, the stolen furniture from Dania into Mr. Armstead's apartment. Could you answer if it were determined that the warrant itself were not in good faith, and so the item seized, the specific item seized under the warrant, which is this folder, can't be admitted and wasn't admitted, where would that leave you as to the bag? I do believe that since officers were in the apartment because of the warrant and then later went out the window, the way the record is right now is that they found the bag as a result of their search of the house. But what I will say is because there is absolutely no doubt in the discovery record that counsel was aware of how that bag was found, exactly how that bag was found, and that was the reason that the government counsel did not explore an equitable discovery at the suppression hearing. I think there is an argument that could be made that because Rusty Hill had used that pack to come from his, from Mr. Armstead's apartment to his car, officers looking for that hard drive would have searched that pack. And it would have been in plain view and available, or at least the bag would have been. It was about 250 feet, 100 yards away from Mr. Armstead's apartment on the path to where Mr. Hill's car, which led to Mr. Hill's car. What are you making of that? Is it almost like an inevitable discovery kind of argument? Is that what you're getting at? Yes. Yes, Your Honor. But I would like to address harmless error if I could because if this court were to find that there was no good faith and then that the bag's seizure was connected to the apartment in such a way that there was no intervening event, there is overwhelming evidence of guilt in this case. And I want to get to that evidence, but first I want to address the evidence found in that bag, of all the victim's information found in that bag. Only one victim of the nine substantive counts, only one victim from that bag is included in those nine substantive counts. Only three victims of the 44 who are on the loss sheet submitted by the Secret Service at sentencing were victims who were connected to that bag. Each of these victims, the one that's a part of the substantive count and the two additional that are part of the sentencing decisions, we found their information in places other than that bag. We had seized IDs from co-conspirators during searches or during arrests. But I would like to talk about the overwhelming evidence. Besides this search in January of 2004, law enforcement had conducted six other searches involving Mr. Armstead, either his house, his hotel room, or seizures from outside his condominium. March 12th, in every single one of these searches and seizures, officers seized victim's information, fake Washington State driver's licenses, financial information. March 12th of 2002, June 19th of 2002, May 15th of 2003, August 16th of 2003, then the January 2004 search, and then again July 29th, 2004, when his hotel room and his car were searched. Every single one of these searches, there was information that the government introduced some evidence. But as for that bag, only one victim is subject to any of the counts of conviction of the nine substantive counts. Of course, a conspiracy count can contemplate more information. As long as you're talking about victims, could you talk about the issue of counting victims and your view of how that fits in the sentencing guidelines? The government's position is that all of the individual victims are victims, and their losses were included at one point in the actual loss chart. What happened was their losses were reimbursed by the banks, who then are. When you say at one point, that implies that they were not in the final loss calculation, right? Well, in the government's sentencing charts, they actually, the sentencing chart that was the bulk of the loss in this case, which is, and I can get the site for your government's excerpts of record 542, and then government's excerpt of record 540 is the Secret Service chart. It shows, it actually lists the individual victims on the loss chart. So it has a fraud victim as a bank, the actual loss, the attempted loss, and it has the account name and dates, which actually lists individual victims. And in this chart alone, there are 41 individual victims listed, and then the additional, I believe, 15 banks. And at the top of the chart, it has total victims as 147. So this chart comprises 41 actual or individual victims' losses, totaling $298,000. And then the question is, these victims on this chart were later reimbursed for the bank loss by the banks. Okay. So would you just go through the numbers again? Because this says 147 victims, but page 540 has around 40-some people. Yes. And what the government said at sentencing was that this chart represents just a fraction of the total amount of loss and victims in this case. So what the Secret Service did was take a period of time, which was from June 2003 to September 2004, although the conspiracy ran from 2000 until 2004, and they took victims, and these 41 victims, and did an analysis of actually what the bank loss was for these victims. How do we know what's the document that would link victims who sustained actual loss so that you would meet the guideline word and language? These are the victims who were using the actual loss for, in GR 540, these victims who are listed, the individual victims, are the ones that make up in GER 542 the Secret Service loss chart. But I'm having trouble with, there seems to be a gap in the numbers. Okay. And I understand this is an extrapolation of a period of time of how it works with some of these victims. But where's the list of the other people? At sentencing, there was an agent available to testify about the 150 victims, and there was a chart he had prepared at sentencing the government proffered that he was available and that he would testify about these 150 victims who were identified. And they were identified. The 150 number was arrived by taking every victim who was a part of those searches and listing them. And then this chart is arrived at by just taking a section of that, those victims whose. So is his proffer chart an exhibit that I can look at? No, it's not, Your Honor. So how can I look at it? I can't. You can't. The government proffered that he said there were 150 victims. Was there an objection to the victim calculation at that point? There was no objection to the government proffering in this way, but the objection to how the victims would be calculated was noted, and that was one of the issues that was. Don't you think this is a problem in the sense that if you have a proffer and you don't even have it marked, you still have to be admitted if you're going to make a proffer, but it's not marked, so it's not part of the record, I don't know where that leaves you in terms of the definition under the guidelines. Well, the victims in, I think, in GR 540, there are a list of victims, individual names, and I think from that list there are 41 individual victims. Okay. So you can get 41 plus the banks. Fifteen banks would put us over. And also in the supplemental excerpts of record, there are victims who list actual out-of-pocket losses who could be included as well, although the judge did make a discrete finding as to their losses being included, but they certainly could be contemplating the range of 400,000 to a million. But you say here at the top there were 147 victims. Assuming you could document 41 plus 15 plus a handful of people who have these, I guess, these other out-of-pocket pecuniary losses, that would get you to what number? Over 50, Your Honor. More than 50. And that's what the. No, that's the break point. That was the break point, and that's what the Court's finding was, that there were over 50 victims. No, but what about the point you're pointing to, that you have to tie the victims to the amount of the loss? And I think the chart at GR 540 does. It lists the loss associated with the individual victims and then also lists the loss in the same line with what the bank actually reimbursed. What are you talking about? What was that, 540? Government's excerpts of record 540, and it was a sentencing exhibit the government included in its sentencing reminder. So let me just take an example. When it says that the actual loss is 20,000 under Bank of America and has a lady's name, and then it says attempted loss is zero, then there's an actual loss of 20,000 and no reimbursement on that. I'm sorry. Which line are you looking at, Your Honor? Oh, I was picking line 1, 2, 3. Ms. Smith, can you explain? Sure. So actual loss, as the Court knows, in the guidelines can be both intended and actual out-of-pocket. And so what this chart is getting at is actually what Bank of America never was reimbursed for, and then the attempted would be if they could have. No, but it's not what it's intended or, you know, what it could be. It's what the district court actually found the loss amount to be, right? I mean, that's what we have to go by. And the court found the actual loss to be over $400,000. It's not very clear. I mean, in other words, he says it's but not very much over, right? So you don't know what to find. Because, you know, he says it doesn't take much to get over 397. So he says I'll find it to be 400, which means what? He thinks it's 400 or 401. Not a million. But if you take the 397, starting with the what the PSR finds, it does start with the Secret Service spreadsheet of 296, right? Yes, it does. So presumably all those victims are included. Yes.  Yes. And the district court found the loss amount to be over 396, at least in the calculated amount. Yes, Your Honor. At the very least. Yes, Your Honor. Okay. Thank you. Thank you, counsel. Going back to the government's argument on good faith and probable cause, the government essentially said that you look at Armstead's past involvement in identity types of crimes, and you look at the types of crimes that he was involved in,   you look at Rusty Hill's involvement with Armstead, and you look at the things that have been in the past recovered from Armstead's residence or parking lot, and you get probable cause. What you get, ladies and gentlemen, is you get probable cause to believe that there might have been identification documents. If the warrant were for identification documents or fraudulent IDs, then you would have found probable cause. The warrant was for a hard drive, for Rusty Hill's hard drive. Under those circumstances, these other facts don't establish probable cause, and they don't provide sufficient indicia of good faith reliance. The government also suggests that you shouldn't consider the argument about what the officers knew in addition to what was in the warrant in your good faith analysis. But these facts were all in the record of the trial court, and this court looks at a good faith determination de novo. So there's no reason for this court to ignore the evidence before it as to the officers' knowledge of what had been searched and what hadn't been searched at Mr. Hill's residence. I'm not quite sure I understand why you think if there are separable parts of a house and he lives in one part of the house and his parents live in the other, why do you think they had to search the parents' part of the house? I don't know that we know that there are separable parts of a house. It wasn't a duplex where there were two separate houses. It appears from the record that it was a house and he was living in the basement. But, in fact, when the rest of the house is still part of the same house, he has access, free access up and down to his grandparents' quarters. No, they searched that and we've been here on a motion to suppress because he lived in the basement apartment, not in the parents' upstairs. They had a warrant to search the entire house. The warrant wasn't limited in any way to Mr. Hill's quarters. I'd also like to address the counsel's failure to object once again to the bag when the court made its ruling. At the suppression hearing, the court first ruled there was no probable cause. The court then ruled, but I'm going to give credence to what the issuing judge found and say there was good faith. It's after that, after she ruled against Mr. Armstead that she said, but the bag was outside the apartment, so it doesn't count. At that point, he had no reason to continue arguing. But wait a second. It was tied to the warrant because she had already ruled that the warrant was okay or that the search was okay because of the good faith reliance. He didn't have a duty at that point then to go on and say, no, no, we have another argument because she already said they could search the apartment because of their good faith. I believe my time is up. Thank you very much. Thank you, counsel. The case just argued will be submitted.
judges: Reinhardt, Tashima, McKeown